## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

BRADFORD FRIEDRICH,      :
      :
        Plaintiff    :    No. 3:14-CV-2181
      :
      vs.      :    (Judge Nealon)
      :
CAROLYN W. COLVIN, Acting    :
Commissioner of Social Security,    :
      :
        Defendant    :

**FILED
SCRANTON**

JAN 2 2 2016

PER_____
DEPUTY CLERK

### MEMORANDUM

On November 13, 2014, Plaintiff, Bradford Friedrich, filed this instant appeal[1] under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of the Social Security Administration ("SSA") denying his application for disability insurance benefits ("DIB") under Title II, 42 U.S.C. § 1461, et seq. (Doc. 1). The parties have fully briefed the appeal. For the reasons set forth below, the decision of the Commissioner denying Plaintiff's application for DIB will be vacated.

---

1. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

## BACKGROUND

Plaintiff protectively filed[2] his application for DIB on April 8, 2013,

alleging disability beginning on December 27, 2011, due back, knee, hip, and

mental health problems resulting from a motor vehicle accident in which Plaintiff

was hit by a drunk driver. (Tr. 247).[3]  The claim was initially denied by the

Bureau of Disability Determination ("BDD")[4] on May 21, 2013.  (Tr. 21).  An

initial hearing was held on November 8, 2013, before administrative law judge

Sharon Zanotto ("ALJ"), at which Plaintiff testified.  (Tr. 37).  On April 21, 2014,

a second oral hearing was held, at which Plaintiff and impartial vocational expert

Leah Zarek, ("VE") testified.  (Tr. 76).  On April 30, 2014, the ALJ denied

Plaintiff's claim.  (Tr. 18).  On June 20, 2014, Plaintiff filed a request for review

with the Appeals Council.  (Tr. 15).  On September 15, 2014, the Appeals Council

concluded that there was no basis upon which to grant Plaintiff's request for

---

2. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

3. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on January 21, 2015.  (Doc. 11).

4. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

review. (Tr. 1-3). Thus, the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on November 13, 2014. (Doc. 1). On January 21, 2015, Defendant filed an answer and transcript from the SSA proceedings. (Docs. 10 and 11). Plaintiff filed a brief in support of his complaint on March 6, 2015. (Doc. 12). Defendant filed a brief in opposition on April 9, 2015. (Doc. 13). Plaintiff filed a reply brief on April 16, 2015. (Doc. 14).

Plaintiff was born in the United States on July 9, 1981, and at all times relevant to this matter was considered a "younger individual."[5] (Tr. 247). Plaintiff eared his GED in 2001, and can communicate in English. (Tr. 259, 261). His employment records indicate that he previously worked as an air quality technician, an induction furnace helper, an order selector at a warehouse, and in multiple jobs at a recycling center. (Tr. 249). The records of the SSA reveal that Plaintiff had earnings in the years 1997 through 2003 and 2005 through 2011. (Tr. 233). His annual earnings range from a low of no earnings in 2004 to a high of

---

5. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). "Younger person. If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45-49 are more limited in their ability to adjust to other work than persons who have not attained age 45. See Rule 201.17 in appendix 2." 20 C.F.R. §§ 404.1563(c).

twenty-one thousand thirty-nine dollars and fourteen cents ($21,039.14) in 2009. (Tr. 233).

In a document entitled "Function Report - Adult" filed with the SSA on April 28, 2013,  Plaintiff indicated that he lived in a house with his family.  (Tr. 181).  When asked how his injuries, illness or conditions limited his ability to work, Plaintiff stated:

> I'm not able to walk without a severe limp.  I can't lift, bend over, I can't even sit for any significant period without having to move around, even a 20 min[ute] car ride is uncomfortable. I can't get on/ off equipment.  I hate to drive in a car since getting hit and I have trouble staying awake [because] of med[ications].

(Tr. 283).  Before his illnesses, injuries, or conditions began, Plaintiff was able to enjoy and spend time with his family and friends, eat, work, sleep through the night, care for his house, walk, and drive without fear.  (Tr. 283).

At the time the function report was completed, Plaintiff, along with his wife, took care of their two (2) children, and was able to let the pets outside.  (Tr. 283). In terms of personal care, Plaintiff bathed when he had to leave the house and stayed in sweats as often as he could.  (Tr. 283).  He was able to prepare his own, "easy" meals every three (3) days or so a week and perform household chores, such as laundry, on a daily.  (Tr. 284).  When asked to check what activities his

illnesses, injuries, or conditions affected, Plaintiff did <u>not</u> check talking, hearing, seeing, or understanding. (Tr. 287).

Regarding his concentration and memory, Plaintiff needed special reminders to take care of his personal needs, take his medicine, and go places. (Tr. 284, 286). He could count pay bills, count change, handle a savings account, and use a checkbook. (Tr. 285). He could pay attention for "usually not even 10 minutes," was unable to finish what he started, and followed spoken instructions "ok." (Tr. 287). He did not handle stress well. (Tr. 288).

Socially, Plaintiff only left the house for appointments, and could not drive, but could ride in a car. (Tr. 284). He watched television and spent time with his family, but could no longer go outside to play with his children or dog. (Tr. 286).

Plaintiff also filled out a Supplemental Function Questionnaire for pain. (Tr. 292). He stated that his pain began when he was hit by a drunk driver. (Tr. 292). His pain was "from head to toe" and included "headaches, shoulder pain, back pain, horrible hip and knee pain, [and] stomach/ abdominal pain." (Tr. 292). His pain had gotten worse since it began, was constant, seemed to be all over some days, and was exacerbated by any movement or any periods that he was still for any length of time. (Tr. 292). He lost weight since his pain began, and was taking Morphine and Oxycodone for the pain, which caused nausea and sleepiness. (Tr.

293). He also used a TENS unit and several different braces, and went to physical therapy. (Tr. 293).

At the first oral hearing, which took place on November 8, 2013, Plaintiff testified that he lived with his wife and two (2) children in a two-story house, with his bedroom being moved to the living room. (Tr. 44). He testified that on December 27, 2011, he was hit by a drunk driver and "ended up being pushed into a house," and that all of his injuries were a result of the accident. (Tr. 45). He had not worked at all since that day because of the severity of his injuries, and was receiving food stamps and had a medical card, but was not collecting unemployment or worker's compensation. (Tr. 46-47).

He was unable to drive and had difficulty climbing stairs because of the pain and having to use walkers and canes. (Tr. 49-51). His sleep was interrupted due to the pain, and was erratic due to the drowsiness the pain medications caused. (Tr. 60). He was most comfortable lying down, and could sit for about one (1) hour at most before the pain would be "intolerable" and would force him to get up and move around to alleviate the pain. (Tr. 61). He was able to stand for about a half an hour, and could walk about one (1) block. (Tr. 62-63). He spent most of his day lying down, stating that in an eight (8) hour period, five (5) hours would be spent lying down. (Tr. 65, 73). He was able to lift ten (10) to fifteen (15)

6

pounds at most, and if he tried to lift more than that, the pain in his back and knees became unbearable and he would have to stop.  (Tr. 68).

He spent his days lying down watching television, and getting dressed and showering were a long process.  (Tr. 69).  His family helped to take care of their children and make meals from morning to night, with different family members coming over on different days.  (Tr. 66, 70).  He testified that he used to be a firefighter and enjoyed fishing prior to the accident, but had not participated in either activity since the accident.  (Tr. 70).

He testified that the body parts affected by the motor vehicle accident were his knees, hips, lower back, neck, chest, feet, and arms.  (Tr. 51). His pain at the time of the hearing was very severe, and Plaintiff rated it at a seven (7) to eight (8) on a pain scale of zero (0) to ten (10).  (Tr. 55).  More specifically, the pain in his knees was constant and throbbing, had become more severe over time, and had become less and less responsive to injections.  (Tr. 55-57).  Regarding his back, Plaintiff testified that his pain had increased after surgery, with numbness and tingling into the back of his legs and feet.  (Tr. 57).  He stated that in terms of his hip pain, it "kind of almost melds together.  It's kind of hard for me to tell whether or not it was the nerves that were acting up from my lower back or it was the bursitis."  (Tr. 58).  He had pain in his upper back and neck, and stated that it had

7

become harder to move his neck around freely. (Tr. 58). He also experienced depression as a result of the accident and the effects it had on his body, stating that he went "to somebody that did all that to in an instant like [he] had everything taken from [him]." (Tr. 70). He further stated, "I never liked asking for help. I held off coming here. In the beginning and for a long time, I thought, you know, I'll get better and I'll be able to go back to work so I waited a very long time before I even applied to come here." (Tr. 72).

He was taking Celebrex, the Fentanyl patch, Dilaudid, Voltaren gel, Neurontin, and Wellbutrin for his symptoms. (Tr. 52-53). The medications would help, but as time went on, they didn't seem to help nearly as well. (Tr. 54). He experienced side effects from these medications, such as drowsiness and dizziness. (Tr. 59).

Plaintiff testified at a second oral hearing on April 21, 2014, at which the ALJ clarified that Plaintiff had to confine his testimony to the relevant time period, which was the alleged onset date of December 27, 2011 through the date last insured ("DLI") on September 30, 2012. (Tr. 78, 82). Plaintiff testified that his medical impairments had deteriorated since the last hearing. (Tr. 80). He stated that he did not immediately seek treatment for his back pain, that started in 2012 as a result of the accident, because he thought it would heal. (Tr. 81). He again

testified that he was able to sit only a half an hour before needing to switch positions due to pain in his lower back and neck. (Tr. 84). He again explained that he hadn't sought treatment for this pain because he believed that getting his knees fixed would help his lower back and that it would heal; however, his knee surgery did not alleviate his back pain. (Tr. 84, 88). His pain level in his back in September of 2012 was a seven (7) or eight (8) out of ten (10), and he spent most of a typical day lying around. (Tr. 85). For the relevant time period, he testified that he also experienced pain in his knees and hips. (Tr. 86). He was taking narcotics to relieve the pain, but they made him feel groggy and drowsy and left him unable to operate a motor vehicle. (Tr. 86). However, despite the drowsiness, his sleep in for the relevant time period was terrible, with Plaintiff sleeping only a "couple of hours at most." (Tr. 88). He could stand comfortably for only forty-five (45) minutes at a time. (Tr. 89). He could lift ten (10) pounds comfortably because of the back and knee pain, and if he tried to lift more, he would drop the object. (Tr. 89). His concentration was "terrible" because of the pain and "everything else that [was] going on in [his] life interfere[d] with [him] being able to concentrate or accomplish pretty much almost anything anymore." (Tr. 89).

## MEDICAL RECORDS

On January 6, 2012, Plaintiff presented to the Emergency Room at The Good Samaritan Hospital in Lebanon, Pennsylvania for injuries sustained in a motor vehicle accident ten (10) days earlier. (Tr. 504). He reported that he lost consciousness, and was experiencing headaches, back pain, and knee pain. (Tr. 504). He was diagnosed with a headache, abdominal pain, cervical muscle sprain, and bilateral knee contusions. (Tr. 504).

On May 10, 2012, Plaintiff had an appointment with Kevin Black, M.D. for right knee pain that began on December 27, 2011, after Plaintiff was hit head on by a drunk driver. (Tr. 362). Plaintiff reported that he experienced diffuse knee pain and retropatellar cracking and popping, and that physical therapy had not been helping. (Tr. 362). Plaintiff's exam revealed he was ambulating with a normal gait, had a normal neurovascular exam of his lower extremities, was pain free in hip joint motion bilaterally, had full motion without an effusion in his right knee, and had normal tilt and translation of his patella. (Tr. 362). Dr. Black ordered an MRI to further evaluate Plaintiff's right knee. (Tr. 363).

On June 14, 2012, Plaintiff underwent an MRI of his right extremity without contrast. (Tr. 360). The MRI impression was that Plaintiff had a small Baker's cyst and a full thickness articular cartilage defect of the median side of the patella.

(Tr. 361).

On June 26, 2012, Plaintiff had an appointment for an injection of Synvisc-One into his right knee after referral for this procedure from Dr. Black. (Tr. 358).

On July 26, 2012, Plaintiff had an appointment with Dr. Black for a follow-up for his right knee injury. His MRI was reviewed, and stated that there was an area of significant chondrosis from the undersurface of the patella, for which Plaintiff was given an injection that did not help. (Tr. 353). His exam revealed that he ambulated with a lip, had stable knee ligaments, and had full motion of his knee without an effusions. (Tr. 353). Plaintiff and Dr. Black discussed surgery, and Plaintiff opted to proceed with the surgery. (Tr. 353).

On September 18, 2012, Plaintiff had an appointment at Hershey Medical Center to complete a history and physical examination in preparation for a right knee arthroscopy with chondroplasty. (Tr. 349). His listed health issues were bilateral knee pain, low back pain, and neck pain. (Tr. 350).

On September 21, 2012, Plaintiff underwent a right knee arthroscopy performed by Dr. Black. (Tr. 390). The procedure demonstrated stable knee ligaments, a normally tracking patella, and no identifiable intra-articular pathology. (Tr. 390).

On October 22, 2012, Plaintiff had an appointment with Dr. Black. (Tr.

11

411).  His pain was the same as it had been preoperatively, and he reported that he

had also been having ongoing left knee discomfort.  (Tr. 411).  Dr. Black ordered

an MRI of Plaintiff's left knee after a normal exam of both knees.  (Tr. 411).

On December 4, 2012, Plaintiff underwent an MRI of his lower left

extremity.  (Tr. 409).  The findings from this MRI were entirely normal.  (Tr. 409).

On December 5, 2012, Plaintiff had an appointment with chiropractor Dr.

Robert Wagner for pain in his lower back, knees, and hips.  (Tr. 418).  Plaintiff

rated his pain at a six (6) to seven (7) out of ten (10) on most days, and described

his discomfort as a nagging ache and pain that worsened with activities of daily

living, such as housework, caring for his children, and prolonged sitting.  (Tr.

418).  Dr. Wagner's physical exam of Plaintiff revealed that all foraminal

compression and distraction testing in the cervical and lumbar spine regions were

positive for reduplication of Plaintiff's post-traumatic sprain syndrome, that

Plaintiff had limited range of motion in flexion and extension in the lumbar spine

region, and that his reflexes were normal.  (Tr. 418-419).  Dr. Wagner diagnosed

Plaintiff with moderate chronic post-traumatic lumbar sprain/ strain syndrome,

chronic recurrent fibrositis, myositis, myofascitis, and myalgia, chronic recurrent

lumbago, and lumbar subluxation complex.  (Tr. 419).  Dr. Wagner recommended

Plaintiff undergo manual therapies including non-manipulative procedures,

neuromuscular reeducation with an arthostimulator, cervical and/ or lumbar manual distraction, and ice therapy. (Tr. 419).

Plaintiff attended his chiropractic appointments with Dr. Wagner on December 6, 7, 11, 12, 14, 19, and 21 of 2012, January 3, 4, 7, 10, 11, 15, 17, 25, and 31 of 2013, and February 1, 4, and 6 of 2013, where he was treated with manipulation, massage, heat and ice therapy, and stimulation by Dr. Wagner. (Tr. 422-429).

On December 13, 2012, Plaintiff had an appointment at Pinnacle Health Spine Institute for neck and lower back pain that had been present for nine (9) to twelve (12) months. (Tr. 393). It was noted that Plaintiff believed the back pain was a result of his knee pain, and that he had numbness, tingling, and difficulty moving. (Tr. 393). He rated his pain at a seven (7) out of ten (10), and that the pain, numbness, and tingling radiated into his legs and hips. (Tr. 393). His symptoms were worse with standing, walking, and sitting, improved upon lying down, and caused Plaintiff an inability to perform his daily routine due to his back pain since the car accident on December 27, 2011. (Tr. 393). It was suggested that Plaintiff undergo a physical therapy evaluation to work on strengthening his lumbar spine and gait, and to reassess if the physical therapy did not help. (Tr. 395).

On January 3, 2013, Plaintiff had an appointment with Dr. Black for persisting right knee pain. (Tr. 407). His exam revealed full motion, no effusion, and stable knee ligaments. (Tr. 407). It was noted that two (2) prior MRIs and an arthroscopy did not reveal any identifiable cause of Plaintiff's right knee pain, but Dr. Black presumed that Plaintiff had chondrosis. (Tr. 407). Plaintiff underwent another Synvisc-One injection, and was instructed to follow-up with Dr. Black. (Tr. 407).

On January 8, 2013, Plaintiff had an appointment at Philhaven Hospital for mental health problems. (Tr. 399). The treatment notes from this visit are largely illegible, but from what could be gleaned, Plaintiff was diagnosed with Major Depressive Disorder (severe with psychosis), Generalized Anxiety Disorder, Attention Deficit Hyperactivity Disorder, and Post Traumatic Stress Disorder. (Tr. 400).

On January 10, 2013, Plaintiff had an appointment with Dr. Wagner for re-examination and a progress report. (Tr. 420). It was noted that Plaintiff continued to exhibit moderate chronic palpable tenderness throughout his cervical, thoracic, and lumbar spinal regions, had multiple levels of subluxation in the C7-T1 levels, and moderate levels of nerve interference. (Tr. 421). Plaintiff stated that he was forty (40) to fifty (50) percent better, and that he was experiencing more times

14

without discomfort.  (Tr. 421).  It was recommended that Plaintiff attend two (2) chiropractic sessions a week.  (Tr. 421).

On January 16, 2013, Plaintiff had an appointment with Victor Faralli, M.D. at Lebanon Orthopedic Associates.  (Tr. 414).  Plaintiff complained on pain in both of his hips.  (Tr. 414).  His exam was normal, except for tenderness in his hips and somewhat of an antalgic gait favoring his right leg.  (Tr. 414).  X-rays were taken and showed normal bony anatomy of the pelvic in both hips with no evidence of significant injuries, degenerative changes, or avascular necrosis.  (Tr. 414).  Dr. Faralli diagnosed Plaintiff with greater trochantaric bursitis and gave Plaintiff an injection which was tolerated well.  (Tr. 414).  Plaintiff was to return to Dr. Faralli as needed.  (Tr. 414).

Plaintiff had appointments with David Keller, M.D. at Lebanon Valley Family Medicine on February 7, 2013 and April 24, 2013 for chronic pain due to the accident and his depression.  (Tr. 435, 456).  He was diagnosed with Depressive Disorder and was prescribed Wellbutrin to manage his symptoms.  (Tr. 436).

Plaintiff also had appointments with Stuart Hartman, D.O. from April 19, 2012 to July 10, 2013.  (Tr. 469-489, 626-640).  At these appointments, Plaintiff complained of pain in his knees, including aching, inflammation, function loss,

painful joints, a decrease in range of motion, tenderness, an inability to bear weight, stiffness, soreness, tightness, and swelling. (Tr. 469, 473, 476, 480, 484, 488, 626, 630, 634, 638). This pain caused interference with his ability to sleep, work, perform household chores, and carry on with a normal lifestyle. (Tr. 469, 473, 476, 480, 484, 488, 626, 630, 634, 638). His exams consistently revealed moderate tenderness of the knee and the patella bilaterally, mildly tender hips and back, and tightness of the quads bilaterally. (Tr. 470, 474, 477, 481, 485, 489, 627, 631, 635, 639). Plaintiff received injections into the bursa, was told to continue taking his narcotic pain medications, and was prescribed Voltaren gel. (Tr. 471-472, 475, 628, 632, 636, 640).

On May 6, 2013, Plaintiff underwent an MRI of his lumbar area without contrast that were ordered by Dr. Keller due to headaches and lower back pain extending down into his lower extremities. (Tr. 536). The MRI of Plaintiff's lumbar area revealed the following: (1) a relatively large central disc protrusion at the L5-S1 producing a high-grade spinal stenosis at this level and impingement of both S1 nerve roots and the right L5 nerve root; (2) a moderately sized disc protrusion at the L4-L5 level with a moderal spinal stenosis at this level and associated foraminal stenoses; and (3) degenerative disc disease particularly at the two (2) lowest levels of the lumbar spine. (Tr. 536).

On May 14, June 3, and August 30, 2013, Plaintiff had appointments at Prism Center for Spine and Pain Care for lumbar epidural steroid injections into the right L4-L5 disc level due to lumbago which were performed by Dr. Rolle. (Tr. 677-701). Plaintiff stated that the first injection did not help, but that the second one on June 3, 2013 gave him notable relief from his pain. (Tr. 681). However, he experienced a reoccurrence of his symptoms that warranted a repeat injection on August 30, 2013. (Tr. 681).

On June 6, 2013, Plaintiff had an appointment with Steven DeLuca, D.O. of the Orthopedic Institute of Pennsylvania for neck and back pain brought on by the December 27, 2011 motor vehicle accident. (Tr. 714). Plaintiff reported that he had been experiencing pain, numbness, and tingling into his bilateral feet and his bilateral hands in his middle and ring fingers, that he was having a difficult time lying on his sides and back because of his back pain, and that the injections only gave him some pain relief, but not relief from the numbness or tingling. (Tr. 714). Plaintiff also noted that the Neurontin had not been helping him. (Tr. 714). His exam revealed the following: a slight antalgic gait; a flattened lumbar lordosis; significant pain with forward flexion and extension of the lumbar spine; difficulty with coordination and heel and toe raising; decreased sensation over the dorsal, plantar, and first web space of his bilateral feet; weakness with the hip abductors

17

and flexors; normal reflexes; mild restriction at end range of all directions of neck motion; a positive Lhermitte's sign; weakness in his bilateral triceps; and decreased pinprick sensation in the bilateral middle and ring fingers. (Tr. 714-715). Based on x-rays and the MRI results from the May 6, 2013, Dr. DeLuca diagnosed Plaintiff with a herniated disc at the L5-S1 level greater than the herniated disc at the L4-L5 level that was causing lumbar spinal stenosis and possible lumbar radiculopathy and a possible herniated disc of the cervical spine. (Tr. 715). Dr. DeLuca opined that both diagnoses were secondary to the motor vehicle accident in December of 2011. (Tr. 715). Dr. DeLuca's plan was for Plaintiff to undergo a bilateral lower extremity EMG to assess for radiculopathy, and if that was present, he would recommend lumbar decompression at the L4-L5 and/ or L5-S1 levels. (Tr. 715).

On July 9, 2013, Plaintiff had an appointment with Dr. Black for a follow-up for his right knee pain. (Tr. 593). Plaintiff's examination noted that his right knee had marked crepitation at the patella with extension, tenderness in the medial and lateral joint line anteriorly, full extension with stiff flexion, and a significant amount of guarding. (Tr. 593). Dr. Black stated Plaintiff had right knee pain and chondrosis with arthritis, and administered a Synvisc-One injection into Plaintiff's right knee. (Tr. 593).

On July 31, 2013, Plaintiff had an follow-up appointment with Dr. DeLuca to discuss to discuss the results of an EMG of his bilateral lower extremities that was conducted on June 13, 2013. (Tr. 717). The EMG demonstrated no evidence of lower extremity peripheral neuropathy or radiculopathy. He also underwent an MRI of the cervical spine on June 12, 2013, which revealed foraminal narrowing at the C5-C6 greater than the C6-C7 on the right with no significant central stenosis. (Tr. 717). Plaintiff noted that his back was worsening and he had a difficulty time sleeping or sitting for more than five (5) minutes. (Tr. 717). The Dilaudid and Fentanyl did not "touch the pain." (Tr. 717). Dr. DeLuca again noted the May 6, 2013 MRI results, which showed a moderate central stenosis at the L4-L5 level and a large central disc herniation at the L5-S1 level causing moderate to severe stenosis, with epidurals giving him no significant relief. (Tr. 717). Plaintiff's exam revealed the following: painful range of motion of his lumbar spine; tenderness in the midline of the cervical spine and the periscapular region; decreased sensation over the dorsal, plantar, and web space of his bilateral feet; and mild weakness with hip abductors and flexors. (Tr. 717). Dr. DeLuca's impression was that Plaintiff had: degenerative disc disease with spondylosis of the lumbar and cervical spine; herniated discs at the L4-L5 and L5-S1 level; severe spinal stenosis at the L5-S1 greater than the L4-L5 level; lumbar radiculitis;

19

periscapular muscle pain; possible carpal tunnel syndrome; and discogenic low back pain. (Tr. 718). Dr. DeLuca recommended Plaintiff undergo a discectomy at the L4-L5 and L5-S1 levels with a minimally invasive lumbar fusion. (Tr. 718).

On September 9, 2013, Plaintiff underwent the L4, L5, S1 discectomy and spinal fusion performed by Dr. DeLuca. (Tr. 720).

On September 20, 2013, Plaintiff had a post-surgical follow-up appointment with Dr. DeLuca. (Tr. 756). The plan was for Plaintiff to brace with ambulation, to continue on his pain medications as managed by Dr. Hartman, and to return for a follow-up appointment in two (2) months. (Tr. 756).

On October 1, 2013, Plaintiff underwent Synvisc-One injections into both his knees for ongoing knee pain. (Tr. 760).

On January 9, 2014, Dr. Hartman opined that Plaintiff was temporarily disabled from April 19, 2012 to January 1, 2015 due to back and knee problems. (Tr. 784).

On February 14, 2014, Dr. DeLuca stated the following:

> Regarding [Plaintiff's] back, as mentioned, I initially saw him on 06/06/2013 for chronic severe back pain status post this [motor vehicle accident]. He underwent an MRI on 05/06/2013, which demonstrated disc desiccation at L4-L5 and L5-S1 with a moderate-sized disc herniation at L4-L5 causing moderate central stenosis and a large disc herniation causing moderate to severe spinal stenosis at L5-S1. I then sent

> [Plaintiff] for EMG's of his bilateral lower extremities which
> were done on 06/13/2013, which demonstrated some foraminal
> narrowing at C5-C6 and C6-C7 without significant central or
> foraminal stenosis. [Plaintiff] elected a lumbar spine surgery
> which was done on 09/09/2013. He underwent a lumbar spine
> fusion, L4-L5 and L5-S1 , with decompression at both of these
> levels with complete discectomies and transforaminal lateral
> interbody fusions. [Plaintiff] had some mild wound drainage
> which required antibiotics for a short period of time
> postoperatively. [Plaintiff] is now six months out from his
> lumbar spine surgery and is still improving slowly. There is no
> doubt about it that [Plaintiff's] lumbar spine and knee problems
> are directly related to his motor vehicle accident of 12/27/2011.

(Tr. 785-786).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of
all legal issues decided by the Commissioner. See Poulos v. Commissioner of
Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of
Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55
F.3d 857, 858 (3d Cir. 1995). However, the court's review of the Commissioner's
findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those
findings are supported by "substantial evidence." Id.; Mason v. Shalala, 994 F.2d
1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).
Factual findings which are supported by substantial evidence must be upheld. 42
U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where

the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission,

383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," <u>Cotter</u>, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." <u>Universal Camera Corp. v. N.L.R.B.</u>, 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  <u>Mason</u>, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence.  <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d at 706-07.  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).  Further,

[a]n individual shall be determined to be under a disability only

if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and claims for disability insurance benefits.  See 20 C.F.R. § 404.1520; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy.  Id.  As part of step four, the Commissioner must determine the claimant's residual functional capacity.  Id.  If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not

24

disabled. Id. "The claimant bears the ultimate burden of establishing steps one through four." Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

"At step five, the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and residual functional capacity." Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004).

## ALJ DECISION

Initially, the ALJ determined that Plaintiff met the insured status

25

requirements of the Social Security Act through the date last insured ("DLI") of

September 30, 2012. (Tr. 23).  At step one, the ALJ found that Plaintiff had not

engaged in substantial gainful work activity from his alleged onset date of

December 27, 2011 through his DLI.  (Tr. 23).

At step two, the ALJ determined that Plaintiff suffered from the severe[6]

impairment of the following: "Bilateral Knee Pain Status Post Arthroscopy (20

C.F.R. 404.1520(c))."  (Tr. 23).

At step three of the sequential evaluation process, the ALJ found that

Plaintiff did not have an impairment or combination of impairments that met or

medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P,

Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).  (Tr. 24).

At step four, the ALJ determined that Plaintiff had the RFC to perform light

work with exceptions.  (Tr. 24).  Specifically, the ALJ stated the following:

> After careful consideration of the entire record, the undersigned

---

6. An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities.  20 C.F.R. § 404.921.  Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering.  Id.  An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work.  20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

> finds that, through the [DLI], [Plaintiff] has the [RFC] to
> perform light work as defined in 20 CFR 404.1567(b) except
> that he could occasionally crouch, kneel, and climb ramps/
> stairs; and no ladders/ ropes/ scaffolds or crawling.

(Tr. 24).

At step five of the sequential evaluation process, the ALJ determined that,

given Plaintiff's RFC, he was unable to perform past relevant work, but that

considering Plaintiff's age, education, work experience, and RFC, there were jobs

that existed in significant numbers in the national economy that Plaintiff could

have performed. (Tr. 28).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined

in the Social Security Act at any time between December 27, 2011, the alleged

onset date, and the DLI of September 30, 2012. (Tr. 29).

## DISCUSSION

On appeal, Plaintiff asserts the following arguments: (1) the ALJ erred in

finding Plaintiff's multiple impairments to be "non-severe;" (2) the ALJ erred in

disregarding substantial evidence of record and by failing to adequately consider

how medical evidence following his DLI relates to the medical evidence prior to

his DLI; (3) substantial evidence does not support the ALJ's evaluation of the

opinion evidence; and (5) the ALJ erred by failing to properly evaluate Plaintiff's

27

subjective complaints and failed to properly apply the pain standard.  (Doc. 12, pp. 2-23).  Defendant disputes these contentions.  (Doc. 13, pp. 7-22).

### 1.    <u>Onset Date of Spinal and Mental Health Problems</u>

Plaintiff argues that the ALJ erred in failing to comply with Social Security Regulation ("SSR") 83-20 in evaluating the medical evidence involving Plaintiff's spinal and mental health impairments and concluding that they were not medically determinable impairments established prior to Plaintiff's DLI.  (Doc. 12, pp. 14-17).  Plaintiff discusses that Dr. DeLuca specifically stated that Plaintiff's "'lumbar spine and knee problems are directly related to his motor vehicle accident of 12/27/2011'" and that the ALJ failed to consider that these impairments were slowly progressive impairments that began on Plaintiff's onset date, thus requiring that the ALJ retain a medical advisor to determine the onset date of these impairments.  (<u>Id.</u> at 15).

Defendant counters this argument by stating that these impairments were not medically documented until after Plaintiff's DLI had passed, and, therefore, the ALJ had no duty to find these impairments to be medically determinable impairments for consideration in evaluating Plaintiff's DIB application.  (Doc. 13, pp. 7-10).

As the United States Court of Appeals for the Third Circuit has explained:

> [U]nder 42 U.S.C. § 423(a)(1)(A) and (c)(1), an individual is only eligible to receive disability insurance benefits if she was insured under the Act at the time of the onset of her disability. See also 20 C.F.R. §§ 404.130, 404.315(a); Kane v. Heckler, 776 F.2d 1130, 1131 n. 1 (3d Cir.1985). Here, the onset date of Appellant's disability is critical because it is determinative of whether she is entitled to benefits at all. See SSR 83-20, 1983 SSR LEXIS 25, 1983 WL 31249, at *1 (1983). The ALJ determined, and the parties do not dispute, that based on Appellant's work history, the date when she was last insured was June 30, 1988. Therefore, to be entitled to disability benefits, Appellant was required to show that she became disabled before this date.

Perez v. Comm'r of Soc. Sec., 521 Fed.Appx. 51, 54 (3d Cir. 2013); see also

Winger v. Barnhart, 320 F.Supp.2d 741, 743 (C.D. Ill. 2004) (Claimant who

"worked only intermittently outside the home" and worked primarily as a

"homemaker" was not entitled to DIB benefits, and this denial did not violate

constitutional protections because "the quarters of coverage system: (1) makes the

Social Security program self-supporting, and (2) creates a method of limiting

Social Security benefits for those who have been dependent on their earnings.").

Medical evidence must support a finding of disability onset.  Social Security

Ruling ("SSR") 83-20 states:

> In some cases, it may be possible, based on the medical evidence, to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first

29

recorded medical examination, e.g., the date the claimant stopped working. How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. This judgment, however, must have a legitimate medical basis. <u>At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred. If there is information in the file indicating that additional medical evidence concerning onset is available, such evidence should be secured before inferences are made.</u>

SSR 83-20, 1983 SSR LEXIS 25 (emphasis added).

In <u>Newell v. Commissioner of Social Security</u>, the United States Court of Appeals for the Third Circuit stated that the administrative law judge should have consulted a medical advisor to help him infer the onset date as required by SSR 83-20 and the decision rendered in <u>Walton v. Halter</u>, 243 F.3d 703, 709 (3d Cir. 2001), in which the Third Circuit held that an administrative law judge must call upon the services of a medical advisor in a situation where the alleged impairment was a slowly progressing one, the alleged onset date was far in the past, and adequate medical records for the most relevant period were not available.  347 F.3d 541 (3d Cir. 2003) (holding that in failing to consult with a medical advisor to determine the onset date of an impairment, the ALJ failed to comply with SSR 83-20 and <u>Walton</u>, and thus remand to the Commissioner was warranted);  See <u>DeLorme v. Sullivan</u>, 924 F.2d 841, 848 (9th Cir. 1991) ("In the event that the

medical evidence is not definite concerning the onset date and medical inferences need to be made, SSR 83-20 requires the administrative law judge to call upon the services of a medical advisor. . . ."); Spellman v. Shalala, 1 F.3d 357, 363 (5th Cir. 1993) ("Because Spellman's mental impairment was of a slowly progressive nature, and the medical evidence was ambiguous with regard to the disability onset date, the Appeals Council could not have inferred an onset date based on an informed judgment of the facts without consulting a medical advisor."); Bailey v. Chater, 68 F.3d 75, 79 (4th Cir. 1995) ("The date on which the synergy [of the claimant's numerous ailments] reached disabling severity remains an enigma. In the absence of clear evidence documenting the progression of Bailey's condition, the ALJ did not have the discretion to forgo consultation with a medical advisor."); Gibbs v. Comm'r of Soc. Sec., 280 Fed.Appx. 194 (3d Cir. 2008) ("[T]he ALJ properly followed SSR 83-20's, 1983 SSR LEXIS 25 requirements by calling a medical expert to help determine the onset date of [claimant's] disability"); Mendes v. Barnhart, 105 Fed.Appx. 347, 352 (3d Cir. 2004) (Testimony by a medical expert and medical records from treating physicians provided "evidence of the sort contemplated by S.S.R. 83-20, 1983 SSR LEXIS 25"); Aldrich v. Colvin, 2015 U.S. Dist. LEXIS 47123, *22-23 (M.D. Pa. Mar. 12, 2015) (Conaboy, J.) (upholding the ALJ's decision because the ALJ "complied

31

with SSR 83-20, 1983 SSR LEXIS 25 by relying on the opinion of [the medical advisor] Dr. Tedesco . . .").

In the case at hand, the ALJ failed to comply with SSR 83-20 and Third Circuit precedent in failing to call on a medical advisor to determine the onset date Plaintiff's spinal impairments.[7] It is true that the majority of the medical records for these impairments were not established until after Plaintiff's DLI. On September 18, 2012, before Plaintiff's DLI concluded, Plaintiff listed neck and back pain as health issues during a physical examination at Hershey Medical Center. (Tr. 350). On December 13, 2012, after his DLI, he was then evaluated and began treatment for these issues, stating that these his back and neck pain had been present for the prior nine (9) to twelve (12) months (ie. during the relevant

---

7. While Plaintiff generally states that the ALJ erred failing to call upon a medical advisor to determine the onset date of his mental health impairments (Doc. 12, p. 14), he has failed to brief this argument, and thus this argument has been waived and is not proper for consideration by this Court. See Harris v. Dow Chemical Co., 2014 WL 4801275 (3d Cir. Sept. 29, 2014) (holding that an argument is waived and abandoned if briefly mentioned in the summary of the argument, but not otherwise briefed); Laborers' Int'l Union of N. America, AFL-CIO v. Foster Wheeler Corp., 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it . . . and . . . 'a passing reference to an issue . . . will not suffice to bring that issue before this court.'") (citing Frey v. Grubine's RV, 2010 WL 4718750, at *8 (M.D. Pa. Nov. 15, 2010)); Karchnak v. Swatara Twp., 2009 WL 2139280, at *21 (M.D. Pa. July 10, 2009) ("A party waives an issues if it fails to brief it in its opening brief; the same is true for a party who merely makes a passing reference to an issue without elaboration.") (citing Gorum v. Sessions, 561 F.3d 179, 185 n.4 (3d Cir. 2009)).

time period). (Tr. 350, 393). Most importantly, on February 14, 2014, Dr. DeLuca issued a report stating that "[t]here is no doubt about it that [Plaintiff's] lumbar spine and knee problems are directly related to his motor vehicle accident of 12/27/2011." (Tr. 786). Based on this clear opinion rendered by Dr. DeLuca, this Court is therefore unsure of how the ALJ would arrive at the conclusion, absent an opinion from a medical advisor to help ascertain the onset date of the spinal impairment, that the onset date of Plaintiff's spinal impairment was not December 27, 2011. The ALJ thus violated SSR 83-20 and the aforementioned Third Circuit precedent in not calling upon a medical advisor to ascertain the onset date of the spinal impairment. As such, remand on this basis is necessary, and this Court declines to address Plaintiff's remaining assertions.

## **CONCLUSION**

Based upon a thorough review of the evidence of record, it is determined that the Commissioner's decision is not supported by substantial evidence. Therefore, pursuant to 42 U.S.C. § 405(g), the appeal will be granted, the decision of the Commissioner will be vacated, and the matter will be remanded to the Commissioner for further proceedings.

A separate Order will be issued.

**Date**: January 21, 2016

/s/ **William J. Nealon**
**United States District Judge**

33